Chief Justice Robertson
delivered the Opinion of the Court.
This is an action of trover, by Walker Kidd against The Lexington and Ohio Railroad Company, for the alleged conversion of a slave named Philip.
The facts exhibited in the record are, in effect, briefly these. On a Sabbath day, in October, 1835, Philip, who was then in the possession and service of one Drake, under a contract of hiring from his master, (Kidd, the plaintiff,) for one year then unexpired, agreed with another slave, who was one of the hands engaged to attend the cars on the railroad, to go, in his place, with them, on that day, from the city of Lexington to Midway, whither the agent of transportation was in the act of starting, with the locomotive and about ten burthen cars, for wood for the city; but the agent — being asked for his approval of the proposed substitution for that trip, and ascertaining from Philip, that he was a slave, and had no authority from his master to go with the cars — told him that he could not go; and, in reply to an expostulation from the slave who desired momentary respite by the substitution of Philip, he told him, also, that he knew that Philip could not go without violating the rules of the company, and that, therefore, he should not go; and then he instantly went from the rear to the front car, and started the train. But the slave who had engaged Philip observed to him, “ Come along, he will take you;” and both of the slaves got upon the rear car— the agent being on the front one. About seven miles from Lexington, the train made a pause for the purpose 'of supplying the locomotive with fuel and water, and Philip, among others, assisted in putting on wood — the hand, at whose instance he had got on the rear car, be *246 ing still at his post and continuing there until the cars had reached the bridge at Elkhorn, where he jumped off. Shortly afterwards, when the cars were entering Midway, the agent, apprehending that the burthen cars, which had been there disengaged from the locomotive, would do some damage by their continued motion, exclaimed, “ boys, let us get down and stop the cars;” whereupon, Philip, who was then sitting near the agent, jumped off, with others, and being inexperienced, he fell, and had one of his legs crushed under the wheels of one of the cars. He was immediately taken back to Lexington, on the return of the train, and was delivered to Drake, at whose house he died, about three weeks afterwards, in consequence of the wounds inflicted by the car.
Motion for a non suit: overruled.
Evidence rejected.
Instructions giv-
Instructions asked and refused.
After these facts had been proved, and the Circuit Judge had overruled a motion for a non-suit, the agent himself, being sworn as a witness, testified that he did not hear the invitation to Philip to get on the rear car; that he did not observe him, or know that he was on a car, until he saw him in the act of jumping off at Midway, when he directed him, but too late, not to get down; and that, when he requested the “boys” to stop the cars, he intended to address only the persons engaged in the regular service of the train. But the Judge —having excluded his testimony as incompetent on the score of interest — instructed the jury,among other things, “ that, if the agent of the Railroad Company, after he “ knew that Philip was on board of the car, carried him “from one point to another, it was a conversion on the “ part of the Railroad Company.” And afterwards, he overruled the following motions for instructions:—
1. “If the jury believe from the evidence, that Philip “got on the cars without the consent and against the “ orders of the company and its agents, and remained “ on them without being employed or controlled by the “ company or its agents, they must find for the defen- “ dants.” And, 2. “If the jury believe that, neither the “ company nor its agents, took Philip into their control, “ the bare knowledge of the agent of the company, that “ he was on the car, does not make them responsible.”
Verdict &c.
An action for a trespass upon im movable property, can be maintained only by a plaintiff who bad the actual possession when the act complained of was committed.
To sustain trespass for an injury to movable property, or tro-ver for its conver sion, the plain-, tiff must have had , either the actual possession or a right to it from one holding under, or at least not adverse to, him.
Where one happens to be in the possession of another’s property, not holding it ad versely, the owner has a right to assume the imme diate actual possession, and that right draws to him a constructive legal possession. But—
Where property is held for the time being,under a contract which gives the possessor a right to hold it against the owner — as in case of a hiring for a term unexpired — the right to maintain trespass for an injury to it, or trover for a conversion of it, is in the bailee; and neither of those actions can be maintained by the general owner. His remedy is a special action on the case, for the consequential injury to his reversionary interest.
The jury having, on this state of case, found a verdict for six hundred dollars in damages, the Judge overruled a motion for a new trial, and rendered a judgment for the damages so assessed.
Three principal questions are presented to this Court for revision: — 1st. Is the action sustainable? 2nd. Was the agent a competent witness? 3rd. Did the Circuit Court err in either giving, or withholding, instructions?
First. The suit was brought in May, 1836, and the declaration averred a possession of Philip by the plaintiff, and a conversion of him by the defendant, on the first of January, 1836, the day after the end of the term for which he had been hired to Drake. And, admitting that, upon the facts proved on the trial, the jury had a right to decide whether there had been an unlawful conversion by the Railroad Company — the question of law now to be decided is, whether the owner of the slave can, after the expiration of the year for which he was hired to another, maintain trover for a tortious act done by the company during the particular estate of the hirer.
It is an indisputable doctrine of the common law that, in order to maintain an action of trespass, for an injury to immovable property, the plaintiff must have had the actual possession of the property when the tortious act was done. And it is equally well settled that, to support such an action for an injury done to movable property, the plaintiff must have been, either actually possessed of it, or entitled to the possession of it from a person holding it under him, or not adversely to him, when the trespass was committed. When another person may happen to be actually possessed of such property, without holding it adversely to the owner, or without being entitled to hold it against his consent, the general property draws to the owner the constructive possession. But if, at the time of a trespass to personal or movable property, any other person than the owner, not only was in the actual possession of it, but was, by *248 contract, (as in a case of a hiring,) entitled to the possession of it as against the owner himself, the latter COuld not maintain an action of trespass, but could sustain o^y a special action on the case, for consequential damages to his reversionary right: first — because trespass is a forcible intrusion on possession; and, secondly — because the person, rightfully in possession and entitled to-that possession for his own benefit, had an exclusive right to sue for the injury done to his own immediate and exclusive interest.
And neither any adjudged case, nor elementary book, has, so far as we know or believe, made any distinction,, in this respect, between the actions of trespass and trover.. They all seem to require, as indispensable to the maintenance of trover, as well as trespass, that the plaintiff shall have been either in the actual or the constructive possession, when the wrongful act was done. See Chitty on Pleading, 1st vol. title Trover, page 174; 2 Wheaton’s Selwyn, 523; 3 Starkie, 1491; Wilbraham vs. Snow, 2 Saunder’s Rep. 47, a. notes c. e. f; Gordon vs. Harper, 7 Vol. Term Rep. 9; Cro. Ch. 242; 3 Lev. 209; Smith vs. The Sheriff of Middlesex, 15th East, 607; Wheeler vs. Train, 3 Pickering’s Rep. 255; Thorp vs. Burling, 11 Johnson, 285; Smith vs. James, 7 Cowen, 328.
In the case of Ward vs. McCauly, 4 Term Rep. 489— which was an action of trespass by the owner of the property on which a trespass had been committed whilst it was in the possession of a hirer whose term had not expired — Lord Kenyon, after deciding judicially that trespass could not be maintained by the owner, said extra-judicially, that trover would have been the proper form of action. But, in the subsequent case of Gordon vs. Harper, supra, that obitur suggestion was considerately overruled, and the same Judge, with the unanimous concurrence of all his associates on the King’s Bench, decided that a landlord could not maintain trover for the wrongful conversion of furniture, which his tenant was possessed of, under an unexpired lease. And that case seems to have been ever since considered as a ruling case, settling the true doctrine finally and conclusively.
The Judges did not, it is true, directly decide in that *249 case, because it was not- necessary to decide, that the landlord might not maintain trover after the end of his tenant’s term. But the principles of the decision, as given, would not allow such an action, for a conversion during the lease only; nor has any elementary writer on the subject since intimated any such exception from the general rule which they have all recognized.
The general rule jfan1 never mam-tain trespass, or lesslíé can dolt immediatelyafler the tort complain edof; but where cause of ae' tion Tctvoctcts the case forms an exception to the general rule; but that is never the case'where the injury is to personal property,
It is true that Lord Coke, in Co. Lit. 145, b., said that, to maintain trover, the - plaintiff must have property, general or special, and the possession or the right of possession at the time of the conversion, or at the time of suing. He should not, however, be understood as meaning that a right to the possession at the commencement of the suit, would, per se, authorize a plaintiff to maintain trover for a wrong done when he neither had, nor was entitled to have the possession; but as only intending that the right to possession when the suit was brought, might be sufficient for maintaining trover for a continuing conversion, or a new conversion after that right became perfect, or for a conversion which, eo in-stanli, terminated the interest of another person who was in possession, or entitled thereto, when the tort was committed; for, if we misinterpret his meaning, and he intended to say that a reversioner may always maintain trover, after the expiration of the particular estate, and for a conversion during the subsistence of that estate alone, there could be no valid reason why he might not, in every case, sue in trover at^any time after the conversion. And if he meant more than we have supposed, he has, just so far, been conclusively overruled by more modern-authorities, as well as by principle and analogy.
It is certainly a general rule, that a person, who has no right to maintain either trespass or trover, immediately after the perpetration of the tort, can never afterwards maintain eithey of those actions for that wrong. There is an exception from that rule, in those few cases in , . , r .. , , , , ,. r which the cause of action retroacts by relation: as, for instance, in a case of disseizin, in which the disseizee * * may, after regaining the possession, maintain trespass *250 for an injury done to his estate whilst he Vras kept out of the possession of it.
Tho’ a landlord cannot maintain trespass -for cutting timber upon land in possession of his tenant — for a conversion of it after it is cut, he may maintain trover; for the tenant’s interest in the timber ceases upon its severance from the freehold, and the right of property in the landlord draws after it a constructive possession.
Where a slave is let for a term un expired, and so the right of possession in the bailee — if a stran gor gets the slave ■tortiously , and holds him until after the expiration of the term, the owner may maintain, trover for the conversion continued after the right of possession , and consequent constructive possession, had reverted to him. But for a conversion during the term, the right of action, in trespass or trover, is in the bailee. The owner and his bailee can not boi/rhaveactions forthe verysarae tort: and hence, where the conversion is not continued beyond the term of hiring — as where the slave dies before it expires— neither trespass' nor trover can be maintained by the owner. His remedy is by action on the case, Mi supra.
*250 But the reason of that exception does not apply, and has never been authoritatively applied, to a trespass upon, or a conversion of, personal property, whilst in the rightful possession of a person then entitled to retain it for his own benefit.
It is true, also, that, though a landlord cannot maintain trespass for cutting timber on land in the occupancy of his tenant, yet, for a conversion of it after it had been severed from, the freehold, he may maintain trover; because the instant it was so severed from the land, the tenant’s interest in it ceased, and it became the movable property of the landlord, the possession of which he was immediately entitled to, and therefore, constructively held. But none of these reasons can be applied to an owner of personal property who was neither possessed nor entitled to be possessed of it when it was converted by á stranger.
In this case, if there was any conversion, it occurred, and was completed, before Philip was carried back to Drake. After that time, there was no act of conversion. And the only act or acts which could possibly amount to a conversion, certainly did not either terminate Drake’s possession of Philip, or destroy his interest in him. tie. still had a right to keep him, and to maintain an action for the conversion; and that right of action for dámages to himself, could not be barred by any judgment which the owner could obtain in this case.— Can each of them be entitled to maintain independent actions of trover for the same conversion? If they can, principle, precedent and analogy must be totally disregarded. But there was only one conversion, if any, and for that, Drake had an indisputable right to sue in trover. The only remedy, then, which Kidd could maintain is, as we believe, a special action on the case for consequential damage to his reversionary right. Bui the ingenious counsel who prepared his declaration — as if feeling the difficulty to be encountered in an action of trover for the conversion in October, 1835 — averred that the plaintiff was possessed of Philip on the first of *251 January, 1836, and that, on the same day, the Railroad Company converted him to its own use — long after he was dead!
An agent is, in general, a competent witness to prove his own acts within the scope of his authority ; but not where the principal is sued for a tort done by the agent, while in his service, but without his authority ; because, as a judg’t against the principal fixes the agent’s liability to him, and the record will be conclusive as to the amount of damages , the agent is directly interested.
Had Philip continued to live, and had he been actually converted by the Railroad Company, and detained by it from his owner after the expiration of Drake’s term, (that is, January 1st, 1836,) the plaintiff, as owner, might undoubtedly have sustained this action; not, however, for the first tortious act, but for the conversion continued after he became entitled to the possession. But Philip having died before that time, and having, moreover, never been detained from the plaintiff by the defendant, fhe declaration is not true, either in fact or in law; for there was no conversion whatsoever after the termination of Drake’s interest; nor even after October, 1835. And, for the alleged conversion in October, the present plaintiff cannot, in our judgment, maintain this action of trover. As to him, it was no trespass, no conversion; and if he was wronged by the defendant, his damage was altogether consequential, and merely ultimate.
We are therefore of the opinion, that the evidence was clearly insufficient to sustain this action of trover; and that, consequently, the Circuit Judge erred in overruling the motion for a non-suit.
Second. It is a general rule of evidence that an agent is, ex necessitate, a competent witness to prove his own acts within the scope of his delegated authority. But if the principal be sued for a tortious act done by his agent, in his service, but without his authority, express or implied, the general rule is, that the agent is not a competent witness for the defendant; because, as a judgment against the principal will fix the liability of the agent to him, that agent is directly interested in the event of the suit, and, as to the amount of damages for which he will be liable over to the principal, he will be concluded by the record of that suit. 3 Starkie on Ev. 3231-2, and note d.
We are, therefore, of the opinion that,, as the agent’s contingent and ulterior liability to the Railroad Company had not been released, he was not a competent witness for the company in this action..
A negro man em ployed upon the cars of a railroad, asked the agent who managed them, to let him put Philip, another negro, in his place for the day; but the agent, finding that Philip was a slave, refused, and told both that he could not go.— Nevertheless,?., at the instance of the other negro, got on to a car, andwent7miles, and there assisted some in the work, before he was observed by the agent; who did not force him off then, but let him remain until they went7miles more, to their point of destination. There the agent told the hands in his service , addressing them by the appellation ‘hoys,’ to get down and stop the cars_ Philip got down among them, but being inexperi enced, blundered and fell, and the wheels of a car passing over his leg, gave him a wound of which he died in a few days ; and his owner bro’t tro-ver against the railroad co. for an alleged conversion of the slavo: but held, that the mere omission to force the slave from the cars when first discovered, was not,perse,acon version of him— especially as he could be returned in the cars with more safety and expedition, than he could be got home by being sent a-foot; and, upon the whole case, the acts of the co’s agent were not such as to render him or them liable for damages.
*252 Third. In giving and in overruling the instructions which we have quoted, the Circuit Judge, in our opinion, erred.
We cannot admit that, if neither the Railroad Company nor its agent either encouraged or permitted Philip to get on the car, or knew that, he was on it until the train had gone some miles from Lexington, the' simple omission to force him off the instant he was discovered by the agent, was, per se, a conversion of him, in judgment of law, to the use of the company.
On the contrary, we are clearly of the opinion that, in the hypothetical case just mentioned, it might have been better for both Drake and the master of Philip, that the agent of the company should, after discovering that he was on the car, permit him there to remain ,until the return of the train to Lexington, on the same day, than to have forced him off when he was several miles from home, and could not have walked back, if he had been disposed to do so, as soon or with as little hazard, as he might certainly have been carried back on the car. The facts assumed in the three instructions we are considering, do not, in our judgment, exhibit even a semblance of a tortious conversion.
If one man’s slave shall have placed himself on the travelling stage, or wagon, or other carriage, of another man, without his request, or even knowledge, and, after having been carried, or rather after having thus voluntarily gone, some miles, without being ordered off by the driver or owner of the vehicle, he shall have fallen off and been bruised or killed in the fall — surely the owner of the carriage could not, under any plausible pretence, be charged with a wrongful conversion of the slave.
Gwillim, in his edition of Bacon, gives one of the best definitions we have seen, of that kind of conversion which will sustain an action of trover. In speaking of trover, he says, (6 Ba. Abr. 677,) “the action being “ founded upon a conjunct right of property and pos- “ session, any act of the defendant which negatives, or is “ inconsistent with, such right, amounts in law to a con* “ version.”
*253 According to that definition, or any other approved one with which we are acquainted, the Circuit Judge certainly erred in giving and in refusing the instructions which we have been noticing. According to the facts hypothetically assumed in each and all of them, the railroad agent exercised no dominion over Philip; claimed no interest in him or his services, nor either did any thing, or failed to do any thing, whereby he negatived the right of either Drake or Kidd, or which was inconsistent with any right of either of them.
It would not be proper here to consider all the facts which appeared on the trial,' and determine whether any or all of them together could, under any allowable interpretation, be deemed a conversion in judgment of law. As there may be other and essentially different testimony on another trial, we shall now go no farther on the merits of the case, as now presented, than to decide that, in giving and in refusing the instructions here-inbefore noticed, the Circuit Court erred to the prejudice of the plaintiff' in error.
Wherefore, the judgment is reversed, and the cause remanded for a new trial.